**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **Brit Insurance Holdings N.V.**, *et al.*, ) | **CASE NO. 1: 11 CV 948** |
| ) | |
| **Plaintiffs,** ) | **JUDGE PATRICIA A. GAUGHAN** |
| ) | |
| vs. ) | |
| ) | |
| **Marc C. Krantz**, *et al.*, ) | **Memorandum of Opinion and Order** |
| ) | |
| **Defendants.** ) | |

This case concerns professional liability insurance. Pending before the Court is Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaim (Doc. 25). For the reasons stated below, the motion is granted in part and denied in part.

**Facts**

Plaintiffs Brit Insurance Holdings N.V. and Hiscox Dedicated Corporate Member Ltd. – underwriters at Lloyd's, London – (collectively, "plaintiffs" or "underwriters") filed this action against the law firm of Kohrman, Jackson & Krantz, P.L.L. (KJK) and its managing partner Marc C. Krantz alleging that defendants made material misrepresentations to them in applying for and obtaining professional liability insurance.

Plaintiffs' Complaint alleges the following facts. KJK sought professional liability

1

insurance from plaintiffs in June 2009.  At that time, KJK answered in the negative the following question on its application for insurance:  "Having inquired of all partners, officers and professional employees, are there any circumstances which may result in a claim being made against the firm. . . .?"  The application stated that the applicant had "a continuing obligation to report to [plaintiffs] as soon as practicable any material changes in the facts and statements above, and in each supplemental application, of which applicant becomes aware after signing the application."  (Complt., ¶ 14.)  The application also stated that the failure to report "facts, circumstances or events which may give rise to a claim" may create a lack of coverage.  (*Id.* at ¶ 15.)

In 2008, a lawyer at KJK, Ari Jaffe, had provided legal services to Michael Zweig, Charles Brennan, and Phillip Irvin (the Zweig Group) in connection with the drafting and negotiation of employment agreements between the Zweig Group and JP Morgan Chase & Co. (JP Morgan).  In April 2008, the Zweig Group and counsel received a draft offer of employment from JP Morgan with an accompanying draft "Retention Agreement."  The draft Retention Agreement specified that the Zweig Group would receive a single retention performance award based on a three-year average production formula.  (*Id.* at ¶¶ 19-20.)  A single performance award was not acceptable to the Zweig Group.  Mr. Jaffe journalized his clients' desire for a performance award to be paid annually for three years.

On May 7, 2008, Mr. Jaffe and the three members of the Zweig Group participated in a telephone conference with JP Morgan from which Mr. Jaffe and the Zweig Group all understood that JP Morgan "agreed that the employment terms for the individuals in the Zweig Group would include three years of a Retention Performance Award."  (*Id.* at ¶ 24.)

2

However, a Revised Retention Agreement sent by JP Morgan to the Zweig Group and counsel did not provide for a performance award to be paid annually for three years but, instead, stated that the Zweig Group would only be eligible for "an award." "Mr. Jaffe did nothing about the inconsistency and did not bring it to the attention of his clients before they signed their respective Retention Agreements." (*Id.* at ¶ 32.)

In June 2009, the Zweig Group expected to receive the first of three performance retention awards, but by mid-July 2009, when such awards were not paid, the Zweig Group inquired of JP Morgan as to when the payments would be made. At that time, JP Morgan informed the Zweig Group of its position that the Zweig Group was only entitled to one retention performance award under the terms of the Retention Agreements. (*Id*. at ¶¶ 37-38.) Mr. Zweig notified Mr. Jaffe of this problem on July 18, 2009. He told Mr. Jaffe on July 20, 2009, that he considered the "situation a mistake beyond anything imaginable." (*Id*. at ¶ 43.) Further, on July 20, 2009, Mr. Jaffe sought Mr. Krantz's advice regarding the situation. (*Id.* at ¶ 45.)

On July 30, 2009, "after having had several discussions with Mr. Jaffe concerning the potential multi-million dollar mistake described above which could have dire consequences for KJK," Mr. Krantz signed a "Warranty Statement" which became part of a policy of insurance plaintiffs later issued to KJK. In the Warranty Statement, Mr. Krantz represented to plaintiffs:

> [A]s of this date, we are not aware of any circumstances or any allegations or contentions as to any incident, which may result in a claim being made against the firm or any of its past or present owners, partners, shareholder, corporate officers or employees or predecessors in business, since our Application was signed on June 15, 2009.

3

(Complt., ¶ 55.)

Plaintiffs issued a "Lawyers Professional Liability Insurance Policy Number 1051/YO058160W" to KJK, effective August 1, 2009, with a policy period from August 1, 2009, to August 1, 2010 (the Policy).  (*Id*. at ¶ 61.)

On September 23, 2009, KJK submitted a notice of occurrence to plaintiffs followed by subsequent correspondence describing "a potential claim."  (*Id.* at ¶ 67.)  Plaintiffs "corresponded with Mr. Krantz" and confirmed receipt of KJK's notice of potential claim.  At that time, plaintiffs expressly "reserved all of [their] rights under the law and under the Policy, including the right to raise all Policy terms and conditions as defenses to coverage . . . and the right to deny coverage for any claim."  (*Id.* at ¶¶ 68-69.)

The Zweig Group filed a malpractice action against KJK and Mr. Jaffe in the Cuyahoga County Court of Common Pleas on December 30, 2009.  (Complt. ¶ 70.)  Plaintiffs undertook to defend KJK in the action under the Policy but expressly reasserted their position that they did so reserving all of their rights and defenses to coverage under the Policy.  (*Id*. at ¶ 72.)

On August 17, 2010, after discovery was conducted in the malpractice action, plaintiffs wrote a letter to Mr. Krantz expressing plaintiffs' belief that KJK had knowledge or could have reasonably foreseen an act or omission that might have been expected to be the basis of the Zweig Group's claim when KJK applied for insurance.  The letter stated that the information provided in discovery called into question the accuracy of the information defendants provided in seeking the Policy.  Nevertheless, plaintiffs continued to provide a defense to KJK in the Zweig Group's lawsuit pursuant to a reservation of rights while they

4

investigated the coverage situation**.**  In that regard, Mr. Krantz and Mr. Jaffe were deposed on November 16, 2010.  (*Id.* at ¶ 82.)

On January 14, 2011, after the discovery, plaintiffs sent further correspondence to KJK stating:

> Based on our coverage investigation to date, we believe the Assureds "knew or could have reasonably foreseen" that error in the retention agreements between the members of the Zweig Group and JP Morgan Chase "might be expected to be the basis of a Claim," against KJK prior to the August 1, 2009 inception of the Policy.  We also have reason to believe that the "Warranty Statement" issued by KJK to Underwriters in connection with the issuance of the Policy and information provided in the application for coverage failed to disclose material information with respect to the Zweig Group matter.  However, we will be providing our full supplemental coverage position on behalf of Underwriters in the near term.  In the interim, Underwriters have continued to provide a defense to KJK in the Zweig Group litigation subject to an ongoing reservation of Underwriters' rights under the Policy, at law and in equity.

(*Id.* at ¶ 83.)

The January 14, 2011 correspondence also stated:

> Moreover, we must advise you that any payment of "Damages" as defined by the Policy, by Underwriters on behalf of KJK, as well as any payment of "Claims Expenses," will be made subject to a full and complete reservation of Underwriters' rights and defenses under the Policy and applicable law.  Specifically, Underwriters reserve their right to later seek reimbursement and recoupment of any and all amounts expended in connection with the Zweig Group matter . . . .

(*Id.* at ¶ 87.)

On January 28, 2011, a settlement agreement was reached between KJK and the Zweig Group in the malpractice action.  Plaintiffs agreed to fund the settlement subject to a full and complete reservation of their rights and defenses.  (*Id.* at ¶ 89-90.)  On February 24, 2011, plaintiffs transmitted the settlement amount to KJK's defense counsel, who forwarded the payment to the Zweig Group.  As a result of the settlement, the Zweig Group's lawsuit

5

was dismissed. (*Id.* at ¶ 92.)

Plaintiffs filed this lawsuit against defendants on May 12, 2011, seeking to recover the expenses incurred and damages paid in connection with the Zweig Group action and settlement and other relief. Plaintiffs seek rescission of the Policy as a result of the Warranty Statement made by Mr. Kranz on July 30, 2009, which plaintiffs allege to be false (Count One). Plaintiffs also allege claims against defendants for: intentional misrepresentation (Count Two); a declaratory judgment that plaintiffs are not obligated to pay "Damages" and "Claims Expenses" under the Policy (Count Three); negligent misrepresentation (Count Four); and fraud (Count Five).

Defendants filed an Answer and Amended Counterclaim, denying liability to plaintiffs and asserting five counterclaims. (Doc. 23.) Defendants' first counterclaim is that plaintiffs breached their duty of good faith and fair dealing to defendants by unreasonably delaying making a coverage decision regarding the Zweig Group matter and continuing to defend and indemnify defendants under the Policy only under a reservation of rights. In particular, defendants allege:

> 32. [Plaintiffs] file this action on May 12, 2011, finally taking a coverage position, that being that they believe they have no coverage obligations for either the defense of the Zweig Group claim or the indemnification of KJK's purported liability for the claim, which liability [plaintiffs] settled at their desired payment amount. . . . Such delay of at least nine months in reaching and/or communicating a coverage determination, given the status and circumstances of the underl[y]ing Zweig Group litigation, was unconscionable.
>
> 33. Through this course of conduct, including delay and manipulation of timing and failure to take a coverage position and other manipulation of policyholder expectations, [plaintiffs] placed KJK in a highly precarious position on the virtual eve of trial and then exploited that position to the exclusive benefit of [plaintiffs]. The duty of good faith requires an insurer either to timely accept a claim or to timely deny a claim based upon a

6

> reasonable justification; it does not permit an insurer to say, in effect, at the time of its insured's greatest moment of vulnerability, "We won't say whether there is coverage," or "We choose to keep secret whether we believe there is coverage." This course of conduct by [plaintiffs] was carefully orchestrated, pernicious, duplicitous, exploitative, highly coercive, wanton, willful, and malicious.

(Am. Ctrclaim at ¶¶32-33.)

In addition, defendants allege that when plaintiffs filed this action via the Court's electronic filing system, plaintiffs attached to their Complaint – and thus filed with the Court electronically – defendants' application for insurance containing personal and confidential information about KJK and its lawyers, including lawyers' social security numbers, confidential claims information, confidential firm information, and confidential client information. (Am. Ctrclaim at ¶37.) Defendants allege that as a result of plaintiffs' filing of the application electronically, their personal and confidential information was made available to anyone searching the Court's filing system. Defendants acknowledge that plaintiffs moved to have the application sealed upon learning of the disclosure of defendants' personal and confidential information; however, several days elapsed between the filing and the sealing of the application. (Am. Ctrclaim at ¶48.)[1] Defendants allege that plaintiffs' conduct in publicizing their personal and confidential information for the several day period was "malicious, reckless, willful, wanton, and gross" and caused defendants' substantial harm, including: "damage to their reputation"; "shame, embarrassment, and other emotional harm"; "investigation and/or legal costs incurred to determine (I) the nature and extent of the disclosures, (ii) the harm caused by such disclosures, and (iii) the potential liability of KJK,

---

[1] The Court's docket indicates that the disclosures appeared for five days.

its lawyers, and its clients or former clients arising from such disclosures; and (d) expenses associated with fraud prevention and monitoring services." (Am. Ctrclaim at ¶50.) Defendants also allege "the actions of Underwriters will continue to cause [defendants] harm into the future." *Id.*

Defendants allege four counterclaims arising from plaintiffs' filing of their insurance application with the Court:  (1) invasion of privacy (second count); (2) "Breach of Contract: Unauthorized Disclosure of Personal and Confidential Information (third count); negligence *per se* (fourth count); and breach of fiduciary duty (fifth count).

Plaintiffs move to dismiss defendants' counterclaims pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(1)**.**

**Standards of Review**

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint.  In order to survive a motion to dismiss, a complaint's factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.  *Ass'n of Cleveland Firefighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).  That is, the complaint must contain sufficient factual material to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Pursuant to Fed. R. Civ. P. 12(b)(1), a court must dismiss a case when it lacks subject matter jurisdiction. Under Article III of the Constitution, federal courts may only adjudicate actual "cases" and "controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984). Actual cases and controversies require a plaintiff to have standing; that is, a plaintiff must establish that he has suffered an injury-in-fact that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted).

**Discussion**

Plaintiffs contend plaintiffs' claim for breach of the duty of good faith and fair dealing should be dismissed under Fed. R. Civ. P. 12(b)(6) because no such claim exists in the insurance context as a matter of Ohio law unless an insurance claim is actually denied by the insurer. Plaintiffs argue that defendants have no viable bad faith claim here because plaintiffs did not deny any claim or coverage under the Policy but, rather, provided defendants with a defense and paid and settled the malpractice claim brought against defendants by the Zweig Group (albeit under a reservation of rights). Plaintiffs rely on a statement by the district court in *Scott v. Allstate Indem. Co.*, 417 F. Supp.2d 929, 936 (N.D. Ohio 2006), citing the Ohio Supreme Court's decision in *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (Ohio 1994), that "[t]here can be no claim for bad faith unless an insurance claim was wrongfully denied." Plaintiffs cite *Zoppo* for the proposition that the Ohio Supreme Court "has always viewed bad faith as tied to a refusal to pay a claim." (Pltfs. Rep. at 8.)

Defendants dispute that *Zoppo* precludes a bad faith claim absent an outright denial of

9

coverage by the insurer, citing Ohio courts of appeals' decisions decided after *Zoppo*.  In *Zaychek v. Nationwide Mutual Ins. Co.*, Case No. 23441, 2007 WL 1874197, at *3 (Ohio App. 2007), the Ohio Court of Appeals stated:  "We do not agree that Ohio law supports a rule of law that a bad faith claim can never exist absent an insurer's refusal to pay a claim." The Ohio Court of Appeals likewise rejected the position that an insurer's actual denial of coverage is necessary to support a bad faith claim in *Unklesbay v. Fenwick*. 167 Ohio App.3d 408 (Ohio App. 2006).  Addressing the issue in the context of a dispute over the discoverability of an insurer's claim file, the *Unklesbay* Court held:

> It is true that *Boone* [*v. Vanliner Ins. Co.*, 91 Ohio St.3d 209 (2001)] and *Garg* [*v. State Auto Mut. Ins. Co.*, 155 Ohio App.3d 258 (Ohio App. 2003)] involved causes of action alleging bad faith in the denial of insurance coverage.  But an insurance company can exhibit bad faith in other ways as well.  In Ohio, an insurer has a duty to act in good faith toward its insured in carrying out its responsibilities under the policy of insurance.  *Hoskins v. Aetna Life Ins. Co.* (1983), 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315, paragraph one of the syllabus.  Those responsibilities include the handling and payment of an insured's claim.  *Id*.  Thus, "[a]n insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." (Emphasis added.)  *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, paragraph one of the syllabus.
>
> In *Mundy v. Roy*, Clark App. No. 2005-CA-28, 2006-Ohio-993, 2006 WL 522380 . . ., we declined to interpret a bad-faith "refusal to pay" as being synonymous with the denial of a claim.  We reasoned that the insurer's foot-dragging in the claims-handling and evaluation process could support a bad-faith cause of action.

*Id.* at 414.

These Ohio Court of Appeals decisions cited by defendants are persuasive to show that a plausible claim for breach of the duty of good faith may exist in the insurance context under Ohio law even in the absence of an outright denial of coverage by an insurer.

Plaintiffs' position is not persuasive that controlling Ohio law provides that there must be an outright denial of coverage in order to establish a cognizable claim.[2] Furthermore, defendants contend in their opposition that Underwriters effectively refused their claim and "merely fronted the funds for settlement, knowing that they would commence a lawsuit against KJK to recover those funds." (Def. Br. at 11-12.)  In that the Court must view these allegations in the light most favorable to defendants (the counterclaim plaintiffs), plaintiffs' motion to dismiss defendants' counterclaim alleging that plaintiffs breached their duty of good faith and fair dealing in handling the Zweig Group claim is denied.  It cannot be said that defendants' allegations – that plaintiffs intentionally delayed and manipulated the timing of their coverage decision and settled the Zweig Group litigation knowing that they would later take the position that there was no coverage under the Policy – are insufficient as a matter of law to state a bad faith claim.

Plaintiffs argue defendants' remaining counterclaims for invasion of privacy, breach of contract, negligence, and breach of fiduciary duty, arising from plaintiffs' filing of defendants' application on the Court's electronic filing system, should be dismissed because defendants have failed to allege facts demonstrating that they have suffered "any harm from the disclosure," a required element of each the claims.  (Pltfs. Br. at 15.)  Plaintiffs argue that defendants' counterclaims "offer no more than conclusory statements of harm."  Plaintiffs argue:

---

[2] In *Zoppo*, the insurer *had* denied coverage, and the court stated that "an insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor." *Zoppo*, 71 Ohio St.3d at 540.  However, *Zoppo* did not consider whether a bad faith claim could exist in the absence of a denial of coverage.

> There are no allegations that Defendants have had their personal information stolen. There are no allegations that anyone has accessed their accounts in an unauthorized fashion. There are no allegations of identify theft. There are no allegations that any of KJK's clients have complained about the disclosure or been prejudiced by it. Defendants do not even allege that anyone– other than the Court and counsel– even saw the application when it was on PACER. There are simply no allegations that anything has happened as a result of the disclosure.

(Pltfs. Br. at 14-15.)

In addition, plaintiffs argue defendants lack standing to assert the counterclaims (and thus the counterclaims should be dismissed pursuant to Fed. Civ. P. 12(b)(1) as well as Fed. R. Civ. P. 12(b)(6)) because the counterclaims do not allege a present injury-in-fact. Plaintiffs cite federal cases which held in the identity theft context that a plaintiff lacked standing, or did not suffer damages for purposes of stating a claim, where the plaintiff faced only an alleged risk of *future* injury from a wrongful disclosure of confidential information but did not suffer an actual, present injury. (*See* Pltfs. Br. at 15-19.) For example, in *Key v. DSW, Inc.,* 454 F. Supp.2d 684 (S.D. Ohio 2006), the district court held that a customer lacked standing to assert negligence, breach of contract, conversion, and breach of fiduciary duty claims against a store in connection with the store's disclosure of the customer's confidential financial information to unauthorized third parties. The court held that the customer's claimed injury, that she was subjected to a substantially increased risk of identity theft and other related financial crimes as a result of the store's conduct, was insufficient to show "actual or imminent injury" for purposes of establishing standing. Granting a motion to dismiss, the court held:  "In the identity theft context, courts have embraced the general rule that an alleged increase in risk of future injury is not an 'actual or imminent' injury'" where the plaintiff did not allege that her personal information had actually been obtained or

12

misused by a third party. *Id.* at 689. The court reasoned:

> Plaintiff alleges that her potential injury is contingent upon her information being obtained and then used by an unauthorized person for an unlawful purpose. Moreover, the scope of the harm, if any, that Plaintiff would suffer remains entirely unknown until it actually occurs. At the present time, Plaintiff has not alleged evidence that a third party intends to make unauthorized use of her financial information or of her identity. The mere inquiry as to who would cause harm to Plaintiff, when it would occur, and how much illustrates the indefinite, and speculative nature of Plaintiff's alleged injury. In sum, Plaintiff's claims are based on nothing more than a speculation that she will be a victim of wrongdoing at some unidentified point in the indefinite future. Because Plaintiff has failed to allege that she suffered injury-in-fact that was either "actual or imminent," this Court is precluded from finding that she has standing under Article III.

*Id.* at 690.

In addition, plaintiffs cite wrongful disclosure cases holding that an insured's alleged costs and expenses in obtaining credit monitoring or credit protection services to protect against the risk of future harm are insufficient to confer standing because such "expenditure of time and money was not the result of any present injury, but rather the anticipation of future injury that has not materialized." *Randolph v. ING Life Ins. & Annuity*, 486 F. Supp.2d 1, 8 (D.D.C. 2007). The *Key* court explained the reasoning behind such a holding:

> The plaintiffs contended that the time and money they have spent monitoring their credit sufficed to establish damages. Granting summary judgment to the defendant on all counts, the court emphasized that the plaintiffs had overlooked that their injuries were solely the result of a perceived risk of future harm. . . . Consequently, the court ruled that the "plaintiffs [had] failed to establish the essential elements of damages."

*Key*, 454 F.Supp.2d at 690 (citations omitted.) *See also Kahle v. Litton Loan Servicing, LP*, 486 F. Supp.2d 705, 711 (S.D. Ohio 2007) ("the cases cited by Defendant clearly reject the theory that a plaintiff is entitled to reimbursement for credit monitoring services or for time and money spent monitoring her credit").

13

Despite plaintiffs' arguments, defendants contend their counterclaims contain sufficient allegations of present harm to withstand dismissal. They argue that damages are "presumed" as to their invasion of privacy claim since the harm caused by the invasion of privacy tort is not economic harm but, rather, "*the harm is the intrusion* into one's privacy." (Def. Opp. at 17, citing *Davis v. Creditors Interchange Receivable Mgmt.*, LLC, 585 F. Supp.2d 968, 977 (N.D. Ohio 2008).) Defendants further argue:

> In addition to the damages presumed as a matter of law, KJK (including Krantz) has alleged that the disclosure of the confidential information has required it to expend time, energy, and resources to analyze KJK's liability for the publication; caused it shame, professional embarrassment, and humiliation, and damaged its reputation; and because there has been a publication of the social security numbers, required KJK to purchase personal credit and identity protection services for its lawyers to prevent further damage, such as identity theft, to them and their families. . . . As such, KJK has made a sufficient allegation of damages to survive a motion to dismiss.

(Def. Opp. at 18.)

As to their third through fifth counterclaims for breach of contract, negligence, and breach of fiduciary duty, defendants argue:

> Contrary to the Rule 12(b)(6) and standing arguments advanced by Underwriters, the disclosure counts go beyond mere allegations of unsubstantiated future harm. Although KJK has alleged that it will incur future harm as a result of Underwriters' actions, the Amended Counterclaim also details concrete, compensable losses that KJK has already suffered. . . . KJK has alleged actual damages in the form of amounts expended to analyze the publication and determine liability and exposure of affected parties, including clients, for disclosures made by Underwriters. KJK has also pled damages for loss of its and Krantz's reputations.

(*Id.*)

Plaintiffs dispute defendants' assertion that damages are "presumed" in invasion of privacy cases. In addition, plaintiffs argue in their reply brief that KJK as an "artificial

entity" cannot assert a claim for invasion of privacy claim as a matter of law.  Plaintiffs also repeat their position in their reply brief that defendants' allegations of damage are merely conclusory and pertain only to hypothetical future harm.  They assert:

> Defendants do not allege how their reputation has been harmed, how they were embarrassed, what they are ashamed of, or what symptoms of emotional distress they suffered. . . .  Moreover, it remains the case that Defendants have still not alleged that anything happened as a result of the disclosure of allegedly confidential information on PACER for five days.  There has, for instance, been no allegation that:
> • any member of the public saw the disclosure;
> • any member of the public did anything with the disclosed information;
> • any KJK attorney had their personal information stolen;
> • any KJK client even knows of the disclosure;
> • any KJK client has complained about the disclosure;
> • any KJK client has been actually prejudiced by the disclosure.

(Pltfs. Rep. at 13-14.)

The parties do not dispute that harm to defendants is an element of defendants' counterclaims for breach of contract, negligence, and breach of fiduciary duty and that defendants must have standing to assert those claims.  Although the Court is obligated to view factual allegations in the light most favorable to the non-moving party on a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim under Rule 12(b)(6).  *Ashcroft v. Iqbal*, 129 S. Ct. at 1949.  Defendants' allegations that they suffered shame, humiliation, embarrassment, and loss of reputation as a result of plaintiffs' disclosure of their personal and confidential information on the Court's electronic filing system for a five day period are purely conclusory in that defendants do not allege a single fact indicating that they actually suffered any of these asserted harms.  As plaintiffs point out, defendants do not allege that *any* person or unauthorized third party actually saw their personal or confidential information on the Court's

15

electronic docket. In addition, plaintiffs' cases demonstrate that defendants' expenditure of resources to investigate the ramifications of plaintiffs' disclosure, and to purchase personal credit and identity protection services to protect against future harm, are insufficient to demonstrate that defendants suffered an actual injury-in-fact. As the court explained in *Forbes v. Wells Fargo Bank, N.A*, 420 F. Supp.2d 1018, 1021 (D. Minn. 2006), without an allegation that a plaintiff's personal information was actually misappropriated, an argument that the time and money spent monitoring a plaintiff's credit suffices to establish an injury "overlook[s] the fact that their expenditure of time and money was not the result of any present injury, but rather the anticipation of future injury that has not materialized."

In short, defendants' allegations of harm are legally insufficient to demonstrate that defendants suffered any actual, present harm or injury-in-fact as a result of plaintiffs' making their confidential information available on the Court's public electronic filing system for five days. Accordingly, defendants' third through fifth counterclaims for breach of contract, negligence, and breach of fiduciary duty are insufficient to survive dismissal.

KJK's counterclaim for invasion of privacy is also insufficient. Defendants assert that their invasion of privacy claim is for "public disclosure of private facts." (Def. Opp. at 17.)[3] As defendants point out, the Ohio Court of Appeals has stated that "the elements of the public disclosure tort are: (1) a clearly private fact; (2) public disclosure of the private fact; and (3) a showing that the matter made public is one which would be highly offensive and

---

[3] Under Ohio law, the tort of invasion of privacy consists of four components: (1) intrusion into the plaintiff's seclusion, solitude, or public affairs; (2) public disclosure of private facts about the plaintiff; (3) publicity that places the plaintiff in a false light; and (4) appropriation of the plaintiff's name or likeness for the defendant's advantage. *Ghaster v. City of Rocky River*, Case No. 1: 09 CV 2080, 2010 WL 2802685, at *8 (N.D. Ohio 2010).

objectionable to a reasonable person." *Greenwood v. Taft, Stettinius and Hollister*, 105 Ohio App.3d 295, 303 (Ohio App. 1995). In that "damage" or actual harm is not stated as an element of a "public disclosure" invasion of privacy claim, the Court does not find defendants' invasion of privacy counterclaim subject to dismissal on the ground that defendants have failed to allege actual harm. "Harm" or injury for purposes of stating a claim appears to exist (as defendants assert) by establishing the elements stated in *Greenwood*.[4] However, plaintiffs persuasively demonstrate in their reply brief that KJK has no cause of action for invasion of privacy. Plaintiffs rely on Section 652I of the Restatement (Second) of Torts, which provides: "Except for the appropriation of one's name or likeness, an action for invasion of privacy can be maintained only by a living individual whose privacy is invaded." Comment c to §652I provides: "A corporation, partnership or unincorporated association has no personal right of privacy. It has therefore no cause of action for any of the four forms of invasion covered by § 652B to § 652E." (Pltf. Rep. at 8.)

As plaintiffs point out, Ohio courts have adopted §652I of the Restatement (Second) of Torts with respect to invasion of privacy claims. *See, e,g., Duer v. Henderson,* Case No. 2009 CA 15, 2009 WL 4985475, at *10 (Ohio App. 2009) (relying on § 652I of the Restatement and holding: "[t]he trial court correctly determined that a trust cannot maintain an action for invasion of privacy"); *Rothstein v. Montefiore Home*, 116 Ohio App.3d 775, 778

---

[4] Furthermore, the district court stated in *Davis*, 585 F. Supp.2d at 977: "If a plaintiff successfully pleads and proves an unjustified intrusion into privacy, he is entitled to nominal damages, as well as actual and punitive damages if the plaintiff proves such damages are appropriate." This also indicates it is not necessary for a plaintiff to plead actual damages in his complaint as an element of the claim.

(Ohio App. 1996) (noting the law that the tort of invasion of privacy is personal and must be brought by "a living individual whose privacy has been invaded"). Thus, KJK, which is not a living individual, may not maintain a cause of action.

Defendants argue in a sur-reply brief that "[b]ecause Ohio allows corporations to assert causes of action over the wrongful publication of defamatory information, it follows that Ohio allows corporations to assert causes of action over the wrongful publication of confidential information." (Def. Surreply at 3-4.) However, defendants seek to assert a claim for invasion of privacy – not defamation – here, and Ohio courts have adopted Section 652I of the Restatement in connection with invasion of privacy claims.

KJK may not assert a counterclaim for invasion of privacy under Ohio law.[5]

**Conclusion**

For the reasons stated above, plaintiffs' motion to dismiss defendants' amended counterclaim is granted in part and denied in part. Plaintiffs' motion to dismiss is granted as to defendants' counterclaims for breach of contract, negligence, and breach of fiduciary duty (counts three through five of the amended counterclaim). In addition, plaintiffs' motion to dismiss is granted as to plaintiffs' motion to dismiss the invasion of privacy counterclaim (count two) brought by KJK. These counterclaims are hereby dismissed.

Plaintiffs' motion to dismiss is denied as to defendants' amended counterclaim for breach of the duty of good faith and fair dealing (count one) and as to the invasion of privacy counterclaim (count two) insofar as it is brought by Mr. Krantz. These counterclaims remain

---

[5] Mr. Krantz however may assert the claim.

in the case.

       IT IS SO ORDERED.


                              /s/ Patricia A. Gaughan
                              PATRICIA A. GAUGHAN
                              United States District Judge

Dated: 1/5/12